IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
      v.                       )      Criminal Action No.
                               )      06-06013-01-CR-SJ-DW
ALVIN HARE,                    )
                               )
            Defendant.         )

## REPORT AND RECOMMENDATION TO DENY
## DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

Before the court is defendant's motion to suppress his statement on the grounds that he was unlawfully stopped, and he made a statement without the benefit of <u>Miranda</u> warnings prior to his post-<u>Miranda</u> statement.  I find that the police lawfully stopped defendant's car, lawfully had him exit the car, lawfully arrested him, lawfully searched the car, and obtained a knowing and voluntary statement after having advised defendant of his <u>Miranda</u> rights.  I further find that the failure to provide warnings at the outset of interrogation was not a deliberate attempt to circumvent the requirements of <u>Miranda</u>.  Therefore, defendant's motion to suppress his post-<u>Miranda</u> statement should be denied.

### I.    BACKGROUND

On July 18, 2006, an indictment was returned charging defendant with possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and

924(a)(2).  On December 1, 2008, defendant filed the instant motion to suppress evidence and statements (document number 20). On December 18, 2008, the government filed a response (document number 20) arguing that the police lawfully stopped defendant because he appeared to be casing a store in preparation for a robbery and because the car he was in was connected to outstanding warrants.

I held an evidentiary hearing on January 5, 2009.  The government appeared by Assistant United States Attorney Joseph Vanover.  Defendant was present, represented by Assistant Federal Public Defender Anita Burns.  The government called as witnesses Platte City, Missouri, Police Officer Shannon Case; Oakview Police Officer Kimberly Whyley; and Platte Woods, Missouri, Police Corporal Richard Langley, all of whom worked for the KCI Airport Police on the date of the incident at issue here (01/05/09 Tr. at 4, 28-29, 97-98).  In addition, the following exhibits were admitted:

P. Ex. 1  Map of airport

P. Ex. 2  Photo of Conoco Gas Station and Convenience Store

P. Ex. 3  Photo of Conoco Gas Station and Convenience Store

P. Ex. 4  10/16/05 Confession to Detective Ortiz

P. Ex. 5  <u>Miranda</u> Waiver

D. Ex. 1  12/25/08 Printout

D. Ex. 3  Officer Whyley's Report

D. Ex. 4  Towing Report

Following the hearing, defendant filed a Supplemental Motion to Suppress Illegally Obtained Statements (document number 24), arguing that the post-<u>Miranda</u> statement was tainted by the confession defendant made prior to being advised of his <u>Miranda</u> rights.  The government responded on January 9, 2009 (document number 27), pointing out that it will not offer in its case-in-chief any of the pre-<u>Miranda</u> statements, and arguing that the midstream-warnings analysis is to be used only where the police intentionally used a two-step interrogation technique to render the <u>Miranda</u> warnings ineffective, which was not done in this case.

A supplemental evidentiary hearing was held on January 13, 2009.  During this supplemental hearing, the government called Officer Whyley and Detective Luis Ortiz, Kansas City, Missouri, Police Department, as witnesses.  No additional exhibits were admitted.

## II. *EVIDENCE*

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1.  On October 15, 2005, Officer Case was eating lunch in a marked police car in the parking lot of the Conoco Station located on KCI Airport grounds (01/05/09 Tr. at 5-6, 7).  Even

3

though he was not on duty, Officer Case was aware of his surroundings (01/05/09 Tr. at 7).

2.   At approximately 12:15 p.m., Officer Case observed a light-colored vehicle park between two gas pumps and the convenience store's front door (01/05/09 Tr. at 6, 9, 10, 20, 24, 32).  The car was parked facing Officer Case (01/05/09 Tr. at 20).  The driver, Duane Vaughn, exited the vehicle, entered the convenience store, and then immediately exited the store (01/05/09 Tr. at 6-7).  The fact that Mr. Vaughn "was in and out" caught Officer Case's attention (01/05/09 Tr. at 6-7).

3.   Officer Case then observed defendant, the passenger of the vehicle, enter the convenience store and exit within ten to 15 seconds (01/05/09 Tr. at 7-8).  After defendant returned to the car, Vaughn exited the vehicle, entered the convenience store, and exited within ten to thirty seconds (01/05/09 Tr. at 9).  When Vaughn returned to the vehicle, defendant again entered and exited the convenience store (01/05/09 Tr. at 9).

4.   Officer Case testified that Vaughn and defendant had entered and exited the convenience store a combined total of six to ten times at this point (01/05/09 Tr. at 10).  The time during which Officer Case observed the individuals entering and exiting the store spanned approximately three to four minutes (01/05/09 Tr. at 10).  Officer Case never observed the individuals pump gas for the vehicle (01/05/09 Tr. at 20, 66).  Likewise, he never saw

4

defendant exit the convenience store with any purchases (01/05/09 Tr. at 23).  The final time Vaughn exited the store, he had something plastic in his hands that resembled a container for a hot dog (01/05/09 Tr. at 23).

5.  This series of events made Officer Case suspicious that the individuals were casing the convenience store to rob it (01/05/09 Tr. at 10).  Officer Case remained in his car the entire time (01/05/09 Tr. at 21).

6.  Officer Case called a road unit for assistance (01/05/09 Tr. at 11, 30).  He did so because he was an airfield officer (01/05/09 Tr. at 11).  Accordingly, he was not allowed to run license plates or make any kind of contact outside the airfield (01/05/09 Tr. at 11).

7.  A road unit, comprised of Officer Whyley and Officer Langley, arrived at the Conoco Station and backed in next to Officer Case (01/05/09 Tr. at 11, 31, 99).  Vaughn and defendant entered and exited the convenience store approximately three to four more times (01/05/09 Tr. at 11, 32-33).  By this point, Vaughn and defendant had been entering and exiting the store for approximately five to seven minutes (01/05/09 Tr. at 17, 23).

8.  Officer Whyley and Officer Langley also observed Vaughn and defendant alternate entering and exiting the convenience store (01/05/09 Tr. at 33, 99-100; Def. Exh. 3).  Officer Whyley

5

observed that while they did so, Vaughn and defendant also looked around the area (01/05/09 Tr. at 33-34).

9.   Officer Whyley and Officer Langley found the men's behavior suspicious and thought they may be getting ready to rob the store (01/05/09 Tr. at 34, 107).

10.   When the last patron left the convenience store, Officer Whyley noticed Vaughn and defendant motion using their heads; defendant was inside the convenience store and Vaughn was in the vehicle (01/05/09 Tr. at 35).   Officer Whyley feared something was about to take place (01/05/09 Tr. at 35).   As a result, she pulled her patrol car forward so Vaughn would have a clear view of her in his rearview mirror (01/05/09 Tr. at 35).

11.   When Vaughn noticed Officer Whyley approaching, he stepped outside the vehicle and motioned to defendant to exit the convenience store (01/05/09 Tr. at 35).   Officer Whyley testified she then ran the vehicle's license plate through dispatch (01/05/09 Tr. at 13, 24, 36; Def. Exh. 3).   The plate came back with multiple warrants for a party with a gender-neutral name (01/05/09 Tr. at 36-37, 70-71, 79; Def. Exh. 3).

12.   Defendant returned to the vehicle and he and Vaughn drove away (01/05/09 Tr. at 11, 35, 100).

13.   Officers Whyley and Langley followed the vehicle (01/05/09 Tr. at 11, 35, 100).   Officer Whyley activated the lights and siren on the patrol car to effectuate a stop (01/05/09

6

Tr. at 37). When the vehicle had stopped, Officer Whyley immediately noticed both Vaughn and defendant reaching underneath the front passenger's seat (01/05/09 Tr. at 37). She feared they were armed (01/05/09 Tr. at 37-38).

14. Officer Langley called Officer Case to assist on the car stop (01/05/09 Tr. at 12).

15. Officer Whyley and Officer Langley approached the vehicle (01/05/09 Tr. at 12, 101). They observed defendant bending forward as if he were putting something under the seat (01/05/09 Tr. at 12, 13, 101).

16. Officer Whyley exited her vehicle and made contact with Vaughn; Officer Langley made contact with defendant (01/05/09 Tr. at 38, 101). Officer Whyley asked Vaughn and defendant to stop reaching (01/05/09 Tr. at 38). She also asked them what they were reaching for and whether there was anything in the vehicle of which she should be aware (01/05/09 Tr. at 38; Def. Exh. 3). Vaughn and defendant responded that there was not (01/05/09 Tr. at 38; Def. Exh. 3).

17. Officer Whyley testified she asked defendant for identification (01/05/09 Tr. at 38). He said he did not have identification but provided his name (01/05/09 Tr. at 38). Officer Whyley next asked Vaughn for identification; he produced a Texas identification card (01/05/09 Tr. at 12-13, 38; Def. Exh. 3).

7

18.   Officer Langley testified he asked defendant for identification (01/05/09 Tr. at 101).  Defendant responded that he did not have any but gave Officer Langley a false name (01/05/09 Tr. at 101-102).

19.   Officer Whyley moved to the rear of the stopped vehicle and attempted to run the information through dispatch (01/05/09 Tr. at 38, 102).  While she was obtaining this information, Officer Whyley noticed that Vaughn and defendant continued to be occupied by something under defendant's seat (01/05/09 Tr. at 40).  They continued to reach and were both completely bent forward (01/05/09 Tr. at 40).  This behavior made Officer Whyley suspect they had a weapon (01/05/09 Tr. at 40-41).  She informed Officer Langley and told him she felt Vaughn and defendant needed to be removed from the vehicle immediately (01/05/09 Tr. at 41).

20.   The officers learned Vaughn had outstanding warrants (01/05/09 Tr. at 13, 38-39, 102; Def. Exh. 3).  The information defendant gave them came back as "Not on File" (01/05/09 Tr. at 38, 102; Def. Exh. 3).

21.   Officer Whyley testified that she and Officer Case approached the vehicle (01/05/09 Tr. at 41).

22.   Officer Case stood at the rear of the vehicle, while Officer Whyley approached Vaughn (01/05/09 Tr. at 41).  Officer Whyley removed Vaughn from the vehicle and handed him off to

8

Officer Case (01/05/09 Tr. at 41, 103). Vaughn was arrested on his warrant and for a probation violation (01/05/09 Tr. at 40).

23.  Officer Langley returned to the vehicle to ask defendant for correct identifying information (01/05/09 Tr. at 102). Defendant became agitated and started arguing (01/05/09 Tr. at 102). Officer Langley asked defendant to step out of the vehicle (01/05/09 Tr. at 102). Defendant turned as if he were getting ready to run and started to pull away from Officer Langley (01/05/09 Tr. at 15, 102; Def. Exh. 3). Officer Langley restrained defendant and placed him in handcuffs (01/05/09 Tr. at 15, 41, 102, 111). Defendant was ultimately arrested for hindering prosecution (01/05/09 Tr. at 80-81).

24.  Officer Whyley testified Vaughn gave consent to have the vehicle searched (01/05/09 Tr. at 42, 103; Def. Exh. 3).

25.  After obtaining consent, Officer Whyley looked underneath the front passenger's seat and saw a handgun (01/05/09 Tr. at 15-16, 42, 103). She removed the handgun from the vehicle, observed it was fully loaded, and secured the weapon (01/05/09 Tr. at 42, 103; Def. Exh. 3). The search also revealed several large hunting knives (01/05/09 Tr. at 43, 61-62).

26.  Officer Langley testified that after the car search, defendant told him his real name (01/05/09 Tr. at 104-105, 108). The officers ran defendant's name and learned he had a felony warrant outstanding from Kansas (01/05/09 Tr. at 105, 108-109).

27.  Officer Langley testified defendant was transported to the Airport Police Station in a paddy wagon (01/05/09 Tr. at 105-106, 111).  Officer Langley believed Officer Whyley put defendant in the paddy wagon (01/05/09 Tr. at 111).

28.  Officer Langley testified he rode from the scene to the Airport Police Station in the patrol car with Officer Whyley (01/05/09 Tr. at 112).

29.  By contrast, Officer Whyley testified she did not learn defendant's name until they were en route to the Airport Police Station.  She also testified she transported defendant to the Airport Police Station in her patrol car (01/05/09 Tr. at 48, 84).  Officer Whyley testified she established a slight rapport with defendant (01/05/09 Tr. at 45).  Defendant told her on the way to the Airport Police Station that he was concerned about spending a long period of time incarcerated and asked if he could call his grandmother (01/05/09 Tr. at 45, 47, 84).  Officer Whyley stated she would allow him the phone call if defendant told her his name (01/05/09 Tr. at 45).  Defendant told Officer Whyley his name, date of birth, and social security number; Officer Whyley let defendant make a phone call on her personal cell phone (01/05/09 Tr. at 45, 47, 52-53, 81).  These statements were not Mirandized (01/05/09 Tr. at 45-46).

30.  Officer Langley testified that when defendant was first placed in the holding cell at the airport police station, he was

10

yelling and rambunctious (01/05/09 Tr. at 114-115). Defendant
stated that he did not like police and that he did not care as he
had already been shot three times in Los Angeles by police
(01/05/09 Tr. at 115).

31. Officer Whyley testified she had a second conversation
with defendant inside the holding cell at the airport police
station (01/05/09 Tr. at 48). Defendant asked to speak to
Officer Whyley and initiated the conversation (01/05/09 Tr. at
49, 51, 106; 01/13/09 Tr. at 6). During the conversation,
Officer Whyley told defendant that he must have a heart because
he wanted to call his grandmother (01/05/09 Tr. at 49). She then
inquired as to what was going on and about defendant's past
(01/05/09 Tr. at 49). Defendant responded by telling Officer
Whyley he had been involved in a shooting incident with to Los
Angeles police officers; he also talked about his gang activity
and tattoos (01/05/09 Tr. at 49-50, 54, 55-56). With regard to
the event at the convenience store, defendant said Vaughn was
going to commit robbery but that defendant was not (01/05/09 Tr.
at 50). Defendant admitted the firearm located underneath the
passenger's seat belonged to him and that he had purchased it on
Independence Avenue for $20 (01/05/09 Tr. at 50, 54). This
conversation lasted approximately 45 minutes (01/05/09 Tr. at
49). Defendant had not been read his <u>Miranda</u> rights (01/05/09
Tr. at 50-51; 01/13/09 Tr. at 8).

11

32.  Officer Whyley testified that while she was in the cell with defendant, she let him call his grandmother a second time (01/13/09 Tr. at 12-13).

33.  Officer Whyley testified it was not her goal to interrogate defendant; she did not plan on asking him questions about being a felon in possession (01/13/09 Tr. at 6, 8, 14). Her purpose in speaking to defendant was to become more educated regarding his gang activity and tattoos (01/13/09 Tr. at 7, 8). She also wanted to offer him help (01/13/09 Tr. at 7-8, 11-12, 14).  Officer Whyley further testified she did not have a plan or scheme to not read defendant his Miranda rights, get him to confess, and then turn him over to someone else who would read him the Miranda rights and obtain a second confession (01/13/09 Tr. at 9).

34.  By contrast, Officer Langley testified Officer Whyley had a 20- to 25-minute conversation through the door to the holding cell (01/05/09 Tr. at 114).  He did not see her enter the holding cell (01/05/09 Tr. at 114).

35.  Defendant's file stated that the Kansas City, Missouri, Police Department's Gang Unit should be contacted if he were stopped (01/05/09 Tr. at 120-121).  Accordingly, Officer Whyley contacted the Gang Unit upon defendant's arrest to inquire whether they wanted to speak to him (01/05/09 Tr. at 120).

12

36.  Officer Langley testified Officer Whyley told Detective
Ortiz with the Kansas City, Missouri, Police Department's Gang
Unit that defendant had been stopped and firearms were recovered
(01/05/09 Tr. at 121).  Officer Langley further testified they
were told to bring defendant to the Kansas City, Missouri, Police
Station and book him for "investigation" (01/05/09 Tr. at 121).

37.  Officer Whyley testified she provided all information
to detectives in verbal form (01/05/09 Tr. at 87).  She does not
recall having a conversation with Detective Ortiz (01/13/09 Tr.
at 19).  Officer Whyley stated she did not share the information
about defendant's gang activity and the firearm with Detective
Ortiz (01/13/09 Tr. at 16).

38.  Officer Langley testified he and Officer Whyley
transported defendant to the Kansas City, Missouri, Police
Department Headquarters in a paddy wagon (01/05/09 Tr. at 118).
Once there, they took defendant to be booked until the Gang Unit
could interview him (01/05/09 Tr. at 119).  Officer Whyley
testified she did not remember transporting defendant to Kansas
City, Missouri, Police Department Headquarters (01/13/09 Tr. at
16).

39.  Officer Langley testified he did not talk to Detective
Ortiz while at the Kansas City, Missouri, Police Department
(01/05/09 Tr. at 119).  He further testified Officer Whyley spoke
to Detective Ortiz both before leaving the airport police station

13

and again at Kansas City, Missouri, Police Headquarters (01/05/09
Tr. at 119-120). Officer Langley stated he did not hear Officer
Whyley tell Detective Ortiz about her conversation with defendant
in which he stated he purchased the handgun for $20 or that they
planned to rob the gas station (01/05/09 Tr. at 122-123).

40. Detective Ortiz is a detective with the Kansas City,
Missouri, Police Department Street Narcotics Unit, Gang Squad
(01/13/09 Tr. at 20). He testified he was informed by phone on
October 15, 2006, that defendant had been arrested (01/13/09 Tr.
at 31-32). The female caller also informed Detective Ortiz of
defendant's movements before the traffic stop and that a weapon
had been located underneath the front passenger's seat (01/13/09
Tr. at 32, 33-34). Detective Ortiz instructed the caller to
transport defendant to Kansas City, Missouri, Police Department
Headquarters (01/13/09 Tr. at 32).

41. Detective Ortiz interviewed defendant on October 16,
2006 (01/13/09 Tr. at 23, 25; Gvt. Exh. 4). Detective Ortiz
testified he did not have any other conversations with Officer
Whyley or with Officer Langley prior to the interview (01/13/09
Tr. at 34).

42. The interview took place on the second floor of Kansas
City, Missouri, Police Department Headquarters; only Detective
Ortiz and defendant were present (01/13/09 Tr. at 24, 28).
Detective Ortiz checked defendant out of the Detention Unit at

14

approximately 10:50 a.m. (01/13/09 Tr. at 23, 24-25, 35; Gvt. Exh. 4). Defendant read his _Miranda_ rights at approximately 11:00 a.m. and waived his rights at approximately 11:01 a.m. (01/13/09 Tr. at 24; Gvt. Exh. 4; Gvt. Exh. 5). Detective Ortiz testified defendant appeared to understand his rights and that defendant spoke to him voluntarily (01/13/09 Tr. at 25-26).

43. Detective Ortiz questioned defendant about the handgun found in the vehicle (01/13/09 Tr. at 26). Defendant admitted the gun was his and stated he purchased it for $100 approximately a week before the day he was arrested from an unknown black male (01/13/09 Tr. at 26-27, 38-39; Gvt. Exh. 4). Defendant stated he became nervous when the vehicle in which he was a passenger was stopped by police, and he placed the gun underneath his seat (01/13/09 Tr. at 39; Gvt. Exh. 4). Defendant also stated the gun did not work (01/13/09 Tr. at 39; Gvt. Exh. 4). The interview concluded at approximately 11:15 a.m. and Detective Ortiz returned defendant to the Detention Unit (01/13/09 Tr. at 24, 28; Gvt. Exh. 4).

44. Defendant Ortiz testified he was not aware that anyone else had talked to defendant (01/13/09 Tr. at 28-29). He did not plan with the Kansas City, Missouri, Airport Police to have them speak to defendant without reading him his _Miranda_ rights, get a confession, and then turn defendant over to him so he could

15

advise defendant of his _Miranda_ rights and obtain the same confession (01/13/09 Tr. at 29).

45.   The Kansas City, Missouri, Airport Police and the Kansas City, Missouri, Police Department have two separate chiefs of police (01/13/09 Tr. at 4).  The Board of Police Commissioners governs the Kansas City, Missouri, Police Department (01/13/09 Tr. at 4).  The City Council governs the Kansas City, Missouri, Airport Police (01/13/09 Tr. at 5).

46.   When a Kansas City, Missouri, Airport patrol officer makes a felony arrest, the suspect is interrogated by a detective (01/13/09 Tr. at 5).  After an arrest, the patrol officer requests permission from either a sergeant or detective to place the suspect on a 24-hour hold (01/13/09 Tr. at 6).

### III. LEGALITY OF THE STOP

Defendant argues that his statements should be suppressed because there were no legal grounds to stop him.

The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops that fall short of traditional arrest. _United States v. Arvizu_, 534 U.S. 266, 273 (2002).  In determining whether an investigating officer had the requisite "reasonable suspicion" for an investigative stop, courts must examine the "totality of the circumstances" in every case to see if the officer conducting the stop had a "particularized and objective

16

basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. at 273.

In United States v. Bailey, 417 F.3d 873 (8th Cir. 2005), officers observed Bailey talking on a pay phone which the officers believed to be disconnected for everything but 911 calls (it had been for three years, but had recently been restored to normal service). Because it was the middle of the night, in a high-crime area, and near a gas station that had recently been robbed, the officers believed Bailey was either casing the gas station in anticipation of a robbery or waiting to participate in a drug deal. They approached Bailey and frisked him due to fears for their safety. The officers found a loaded handgun in Bailey's pocket and placed him under arrest.

The Eighth Circuit held that under the circumstances, the officers had reasonable suspicion to believe that Bailey was committing or was about to commit a crime. The observations of officers "as a whole, rather than as discrete and disconnected occurrences", are considered in determining whether reasonable suspicion exists. United States v. Bailey, 417 F.3d at 877, quoting United States v. Poitier, 818 F.2d 679, 683 (8th Cir. 1987).

In this case, the officers observed defendant and Vaughn going in and out of the convenience store without buying anything. They took turns going into the store six to ten times

17

during a three- to four-minute period.  They did not pump gas
into their vehicle.  When another officer arrived, that officer
observed the pair enter and exit the convenience store another
three to four times without buying anything.  When the last
customer left the store, Vaughn and defendant motioned with their
heads.  The officer believed something was about to occur, so she
parked within clear view of defendant's car and began walking
toward the car.  When Vaughn saw Officer Whyly approaching, he
motioned to defendant to exit the convenience store.  I find that
all of these observations amount to reasonable suspicion that
criminal activity was afoot, justifying an investigative stop.

In addition, the officers ran a check on the vehicle's
license plate and learned that the person to whom the car was
registered had multiple outstanding warrants.  The name of the
person was gender neutral and could have been one of the men
involved in "casing" the store.

Defendant got in the car and he and Vaughn drove away.  The
officers stopped the car, based on the suspected casing of the
convenience store and the outstanding warrants associated with
that vehicle.  The stop of the car was lawful, based on Terry v.
Ohio, 392 U.S. 1 (1968) (where there are articulable facts which,
taken together with the rational inferences from those facts,
would warrant a reasonably prudent officer in believing that
criminal activity is afoot, an investigative stop is justified).

18

In addition to the casing activity and the outstanding warrants, the officers are entitled to consider the suspects' behavior when they become aware of the officers' presence. United States v. Bailey, 417 F.3d at 877; United States v. Dawdy, 46 F.3d 1427, 1429 (8th Cir. 1995). Vaughn's motioning for defendant to exit the store upon seeing the officers, and the two men driving away are factors the officers were entitled to consider in determining whether reasonable suspicion existed.

Defendant argues that later, the warrants were not available and may not have been outstanding at the time of the stop. This is irrelevant. A reasonable but mistaken belief may justify an investigative stop. United States v. Bailey, 417 F.3d at 877 (mistaken belief that suspect was "using" a phone that was inoperable); United States v. Johnson, 326 F.3d 1018, 1022 (8th Cir. 2003) (officer's mistaken belief that assault was about to occur due to Johnson's very loud yelling, using profanity, and gesturing toward a female who appeared to be frightened and backing away justified a Terry stop).

Because defendant was observed casing the convenience store, and because he and Vaughn acted suspiciously upon seeing the officers, and because car they were in was associated with multiple outstanding warrants, I find that the officers had reasonable suspicion to stop the car.

19

## IV. LEGALITY OF THE ARREST

Once the car was stopped, defendant and Vaughn were observed leaning forward as if preoccupied by something under the front seat. They were asked to exit the vehicle. During a valid traffic stop, both the driver and passenger may be ordered to exit the vehicle in the interests of officer safety. United States v. Oliver, 550 F.3d 734, 737 (8th Cir. 2008).

Vaughn was taken into custody because of outstanding warrants. Defendant had provided false identification information and no physical form of identification. When he was asked about his identity, he became agitated and started arguing. When he was asked to step out of the car, defendant turned as if he were getting ready to run, and he started to pull away from the officer. Defendant was arrested for hindering prosecution.

The car was searched pursuant to (1) Vaughn's consent, and (2) incident to Vaughn's arrest. New York v. Belton 453 U.S. 454 (1981) (when a police officer has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile). During the search, the gun was found under the seat in which defendant had been riding and in the area where defendant had been seen reaching.

20

Based on the above, I find that defendant was lawfully arrested and the search of the car, which resulted in the discovery of the firearm, was lawful.

## V.    *LEGALITY OF DEFENDANT'S STATEMENTS*

The government has indicated that it does not intend to use in its case in chief any of the statements made prior to defendant being advised of his Miranda rights.  Defendant seeks to suppress the statement made to Detective Ortiz after he had been advised of his Miranda rights on the ground that defendant made an un-Mirandized confession, and subsequently being advised of his Miranda rights would do nothing to make him think he had a genuine right to remain silent.

> In [Missouri v.] Seibert,[542 U.S. 600 (2004)], the officer first questioned a suspect without administering a Miranda warning and the suspect confessed.  A short time later he gave the suspect a Miranda warning but did not explain that her earlier statements could not be used against her.  After confronting her with her earlier confession, the officer was able to elicit a second confession which was admitted at trial.  The Supreme Court held that it was inadmissible because the officer's interrogation technique rendered the Miranda warning ineffective.  The Seibert plurality offered a number of different factors, including the timing and content of the different stages of questioning, to be used to determine whether to admit a post warning statement made in the course of a two part interrogation.

> Justice Kennedy concurred in the result in Seibert, but wrote separately to express the view that the Court's reasoning would apply only to the intentional use of a two step interrogation process in an effort to circumvent Miranda requirements.  Where there has been no such calculated effort, the admissibility of a post warning statement should continue to be governed by Oregon v. Elstad, 470 U.S. 298 (1985).  In Elstad the Supreme Court

21

held that a post warning confession is admissible so long as it was knowingly and voluntarily made. 470 U.S. at 309. We treat Justice Kennedy's concurrence as controlling since it provided the fifth vote necessary for a majority and since it was decided on narrower grounds than the plurality opinion. Where a defendant alleges that his post <u>Miranda</u> statement was obtained in the course of a two part interrogation, the prosecution bears the burden of establishing by a preponderance of the evidence that the failure to provide warnings at the outset of interrogation was not deliberate.

<u>United States v. Torres-Lona</u>, 491 F.3d 750, 757 (8th Cir. 2007) (internal citations omitted).

I find that Officer Whyly's failure to provide <u>Miranda</u> warnings before talking to defendant was not a deliberate attempt to circumvent the <u>Miranda</u> requirements. Defendant asked to speak to Officer Whyly. They talked about his gang activity and tattoos. He told her about a shooting incident in Los Angeles, and he admitted that the gun underneath the seat belonged to him. He also stated that Vaughn had intended to rob the convenience store. Officer Whyly testified that it was not her goal to interrogate defendant, that he wanted to become more educated about his gang activity and tattoos, and she wanted to offer him help. She allowed him to use her personal cell phone to call his grandmother twice.

Officer Whyly did not share any of the information she learned with Detective Ortiz. Detective Ortiz did not know that defendant had been questioned previously. He advised defendant

of his <u>Miranda</u> rights prior to obtaining a statement from defendant admitting to possession of the firearm.

I find that the government has met its burden of establishing by a preponderance of the evidence that the failure to provide warnings at the outset of interrogation was not deliberate. Therefore, the post-<u>Miranda</u> statement will be admissible so long as it was made knowingly and voluntarily.

The government bears the burden of proving by a preponderance of the evidence that defendant made a knowing and voluntary waiver of his <u>Miranda</u> rights. <u>Colorado v. Connelly</u>, 479 U.S. 157, 158 (1986); <u>United States v. Dougherty</u>, 810 F.2d 763, 772 (8th Cir. 1987). There is no requirement that, to be voluntary, the waiver be the product of a free will. <u>Connelly</u>, 479 U.S. at 170. The sole concern of the Fifth Amendment, upon which <u>Miranda</u> was based, is governmental coercion. <u>Id</u>.; <u>United States v. Washington</u>, 431 U.S. 181, 187 (1977). The voluntariness of a waiver of this privilege depends on the absence of police overreaching, i.e., the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. <u>Connelly</u>, 479 U.S. at 170; <u>Moran v. Burbine</u>, 475 U.S. 412, 420 (1986); <u>Fare v. C.</u>, 442 U.S. 707, 726-27 (1979).

23

An explicit statement of waiver is not invariably necessary to support a finding that the defendant waived his <u>Miranda</u> rights. <u>North Carolina v. Butler</u>, 441 U.S. 369 (1979). An express written or oral statement of waiver of <u>Miranda</u> rights is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. <u>Id</u>. at 373.

> The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived his rights delineated in the <u>Miranda</u> case. As was unequivocally said in <u>Miranda</u>, mere silence is not enough. That doesn't mean that the defendant's silence, coupled with an understanding of his rights and course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. . . . [I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

<u>Id</u>. at 373.

Whether a defendant waived his <u>Miranda</u> rights is a question of fact for the trial judge and must be determined on the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused. <u>Id</u>. at 374; <u>United States v. Dougherty</u>, 810 F.2d 763, 772 (8th Cir. 1987); <u>Stumes v. Solem</u>, 752 F.2d 317, 319 (8th Cir. 1985). The totality of the circumstances test applies. <u>Dougherty</u>, 810 F.2d at 773.

In this case, defendant was advised of his <u>Miranda</u> rights, he read the rights himself, and he signed the form waiving his rights. Detective Ortiz testified that defendant read his

24

Miranda rights, signed the Miranda waiver form, appeared to understand his rights, and spoke to Detective Ortiz voluntarily. There has been no credible evidence presented suggesting that defendant's statement to Detective Ortiz was not voluntary.

## VI. CONCLUSION

Based on the above-stated findings of fact and the law as discussed in sections III through V, I conclude that the police lawfully stopped defendant's car, lawfully had him exit the car, lawfully arrested him, lawfully searched the car, and obtained a knowing and voluntary statement after having advised defendant of his Miranda rights.  I further find that the failure to provide warnings at the outset of interrogation was not a deliberate attempt to circumvent the requirements of Miranda.  Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress statements.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 13, 2009

25